MEMORANDUM OF DECISION
This is an action for the termination of parental rights of Myra G. and Ricardo G., the biological parents of the minor child Ricardo G., born November 9, 1995. This child has previously been found to be neglected by the female biological parent and uncared for by the male biological parent on February 28, 1996 (Dyer, J.).The petition was filed by the Commissioner of the Department of Children and Families ("DCF") on May 2, 1997. The biological parents were each brought to court from separate Connecticut correctional facilities. The parents were ably represented by counsel and vigorously contested the termination of their parental rights.
I. Findings of Fact
The court finds that there is no proceeding pending in any other court affecting the custody of the child. The court heard testimony over two days from two DCF social workers, each of the biological parents, a brother of the respondent, a pediatrician for the child, the warden of Garner Correctional Center, and a York Correctional Center counselor. The court received into evidence social studies, court approved expectations signed by the male parent, arrest and conviction records, attorney's letters to DCF, doctors reports, and a prodigious list of disciplinary reports and disciplinary infraction history of the male parent while in custody. The court makes the following findings by clear and convincing evidence. The sociological history of the parents was presented in the form of testimony of the social workers and the social study (Exhibit # 5). The contents of the social history was not challenged by either of the parents. The information in the social study is sketchy and incomplete.[2] Additional social history was developed in the testimony of each of the biological parents.
A. The Female Biological Parent
Myra G. was born in 1971. She is presently 26 years of age. She testified that she has had a drug problem for eight years. She is a tall handsome, attractive Hispanic woman who speaks CT Page 2340 remarkably well, given her educational limitations. She did not complete high school, she delivered her first child at age sixteen, she did not hold steady employment and she associated with the wrong group of people, according to the maternal aunt who provided information to the social worker. The child born to Myra at age sixteen has been in the care of the maternal grandmother since the child was born. The maternal grandmother now lives in New Jersey. The location of the maternal grandfather is unknown.
Myra had a second child, Matthew, born in November, 1994[3]. She testified that she attempted to maintain an apartment for the child, that the child was born cocaine addicted, that she was on a methadone maintenance program, and that she was on state assistance. She testified that she couldn't provide a proper home for the child so she agreed to allow her mother to take that child as well. Her testimony was somewhat contradictory in that she said she raised him for about 16 months. That seems unlikely in that she admitted that the child who is the subject of this petition, Ricardo, was born less than twelve full months after the birth of the second child, Matthew, and it does not appear that the second child was still in her care when Ricardo was born on November 9, 1995.
At Ricardo's delivery, both Myra and the child tested positive for the presence of heroin and cocaine. Myra's methadone clinic counselor told DCF that Myra missed many individual and group sessions and had positive urines for heroin and cocaine throughout her pregnancy. The child was born a month premature and was suffering from severe withdrawal, symptoms. The child was sedated immediately due to the distress from the addiction. Myra had been found in the hospital bathroom just prior to delivery, with a tourniquet on her arm and a syringe in her possession.
Cocaine-exposed babies show clear signs of addiction at birth. Researchers have found that babies exposed prenatally to cocaine, as to alcohol, have a lower weight at birth, are shorter, and have a smaller head. They cry, often piercingly, shake, show erratic sleep-wake cycles, have trouble feeding, and are difficult to comfort. Due to its effect of raising blood pressure and restricting blood flow to the placenta, cocaine increases complications during pregnancy including prematurity, pre-term labor, precipitous labor, and premature detachment of the placenta. Chassnoff, "Cocaine Effects in Pregnancy andthe Neonate." Karr-Morse and Wiley, Ghosts/from the Nursery, CT Page 2341 Atlantic Monthly Press p. 71 (1997).
The child was in the hospital in special care for at least three weeks. Myra stayed only one night. She left the hospital without being discharged. She testified that she left because she was getting chills, she was sick, edgy, and vomiting because she didn't get her methadone from the hospital staff soon enough. "I left as any addict would" she said. "I returned to the most reliable source, the drug. I didn't come back. . . I didn't want to get attached to him because I knew he was going to be removed from me. I didn't want to see him leave (the hospital) with anyone else so I just stopped going (to the hospital.)" Ricardo is now over two years old. His female parent, Myra, has not seen him outside of those first few days in the hospital.
She said she received no help from DCF. "I didn't know the worker assigned to him (the child). I knew Kathleen was my worker, my impression was she was there to help me, I wasn't offered any help. I received a few letters in the mail telling me that they wanted to see how I was doing and whether I was doing (substance abuse) programs, I didn't go to court because I was addicted to drugs, me and my boyfriend, . . . it wasn't easy to go to court I had to get my bag of dope, I could not attend to nothing I didn't eat or sleep or do anything a normal person would do. I thought about my baby, what I've done, it wasn't right, I'm not proud of it, I tried on different occasions to get help. It didn't work, I would get discouraged, when I was sober, which was very rare, I didn't want to call them I was ashamed. I just backed off, I wanted him to be happy."
For two years Myra was in and out of jail, she admits to stealing to support her habit. She made no attempt to see the child except for two occasions in jail. She had the corrections counselor call DCF. She has not seen the child since she left him in the hospital.
Each time she entered the corrections system she went through detoxification. Each time she entered the corrections system her sentences were so short that she was able only to complete the phase one (out of four) mandatory substance abuse treatment program. She was never in long enough to enter the more advanced, phase two, three or four programs even though she had a class four rating, indicating a need for more advanced programs. She is now completing a one-hundred and five day sentence. She was in need of detoxification when she entered. She says she has been sober for nearly 90 days and will be released CT Page 2342 later this month. She says that she will now stay sober. She admits she cannot care for the child but would like her relatives to care for the child while she works on her sobriety, completes a yet to be defined program, gets a job and secures housing. She is confident that she will remain sober. She is incarcerated and has not been continuously sober on the outside of jail in eight years.
The Petitioner maintains that she has abandoned her child, has failed to rehabilitate herself, and that she has no on-going parent child relationship with the child. The Petitioner asks that her parental rights be terminated.
B. The Male Biological Parent
Myra testified that she and her boyfriend Ricardo were addicted to drugs. He told the social worker that he had a heroin addiction and until he met Myra, he had been clean for a year. When he started spending time with Myra, they began using heroin together.[4] During their time together, the child was conceived.
Studies consistently link pre-natal heroin exposure to a relatively low incidence of brain damage (6 percent) that includes microcephaly and cerebral palsy. As with the other drugs, decreased head circumference, increased prematurity, and decreased birth weight are associated with parental heroin addiction. Like the cocaine babies, infants born to a mother addicted to heroin go through withdrawal and there is an increased risk of infant death. It is interesting to note that children born to heroin-addicted fathers (7.9 percent) showed higher neurological impairment than children born to heroin-addicted mothers (6 percent). It is uncertain whether this is due to a genetic effect or to environmental neglect.
Ghosts from the Nursery, supra, 75.
Immediately after the child was born Myra learned that Ricardo had been sentenced for a probation violation three days earlier, and would also be away from her for several years. The record reflects he received a sentence of six years to serve for possession of narcotics with intent to sell and recently he was incarcerated for a violation of probation. He was sentenced on November 6, 1995 to thirty months on the violation. Ricardo was in the Hartford Correctional Center awaiting sentencing when the CT Page 2343 child was born. He has not been out of jail during the child's life. He is vigorously contesting the petitioner's action to terminate his parental rights.
Ricardo, who is now 38, testified he was "really a bad boy . . . difficult for my mother to control." He said he dropped out of school in the 10th grade when he was 13 or 14 just to hang around. He frequently went back to Puerto Rico, where he was born, with some older street friends. He was arrested and was in a juvenile court program in Puerto Rico. In Connecticut, he was exposed to the juvenile court system for fighting in school. before his arrest on Nov. 7, 1995 and had not used narcotics while he was in jail. Both of those statements were contradicted by him during his own testimony. He admitted using drugs. He has a conviction for use of drugs while incarcerated.
His arrest record as an adult begins in 1977, when he was sixteen years and four months old. Before he reached seventeen he had been arrested five times for various offenses including carrying a dangerous weapon, possession of a sawed off shot gun, altering identification on a firearm, interfering with an officer, three assault arrests and one drug offense. His criminal history (Exhibit 15) demonstrates a consistent pattern of ever-increasing criminal conduct resulting in numerous periods of incarceration. His brother Antonio testified in court, that testimony together with Ricardo's arrest record, support a finding that there are presently outstanding charges pending against Ricardo for assault in the third degree, tampering with a motor vehicle, threatening and failure to appear. Apparently, when Ricardo was last arrested, he gave his brother's name to the police and his brother was subsequently erroneously arrested by the Hartford police. Those charges are still pending. Ricardo says he has asked for a speedy trial on those outstanding charges.
Ricardo has attended most, if not all, of the court hearings since the child was removed from the home. The court issued writs of habeas corpus to each of the correctional centers to bring him to court. At an early court hearing, Ricardo signed expectations (Exhibit # 1) agreeing to do essentially two things while incarcerated; sign releases as requested by DCF and to "participate in whatever services available in prison for substance abuse and accept substance abuse treatment as recommended upon release." CT Page 2344
The Connecticut correctional system has available a four tier substance abuse program for incarcerated inmates. Since the programs are time consuming, only inmates with relatively long sentences could complete all four tiers. Ricardo did have a sufficiently long sentence to complete the substance abuse program, but he did not.
A Stipulation was proposed by his attorney and agreed to by the Assistant Attorney General and the petitioner, which stipulated, in essence, that Ricardo, who was transferred in October, 1997, to Northern Correctional Center, a "super-maximum" security facility was not eligible for a substance abuse program. He is in lock-down twenty-three hours a day. The stipulation also stated that Ricardo, while at Garner Correctional "was not eligible to participate in any programs to address his substance abuse issue." This stipulation was apparently suggested by the respondent as a defense to his failure to meet the expectation to participate in whatever substance abuse services as are available in prison. This court is not amused by this claim. It is without merit.
Ricardo was not eligible for participation in any personal rehabilitation programs because of his total lack of personal discipline and his complete inability to conform to prison regulations. (See Exhibits # 6, 7, 8, 9, 10, 11, 13 and 14.) His offenses in prison include, giving false information, membership in a security risk group (gang-membership), fighting, security tampering, disobeying direct orders, impeding orders, causing disruption, threatening to kill, violation of unit rules and intoxication.
His continued and progressive undisciplined behavior has resulted in loss of every privilege available to inmates, including substance abuse programs, inmate phone and visitation privileges and "good-time". He has been punitively segregated and removed from the general population to progressively more secure facilities. In each facility he has had the opportunity to obey the rules, conform to the regulations and to conduct himself civilly. In each facility his conduct violated the rules. He is proud of his designation as a "System Failure." It designates him as beyond remediation; incorrigible. He has been sent to the most secure, super-maximum holding facility in the state to join those who are beyond rehabilitation. Few people have a documented history signaling "career criminal" as has Ricardo. He was undisciplined as a child and is unable to behave as an adult CT Page 2345 "Sometimes you can't avoid disobeying the orders" he said.
Good discipline is close behind health, happiness and success on parents' most wanted list for their children, and it often tops their lists . . . The Oxford English Dictionary defines the noun `discipline' as `the order maintained and observed among persons under control or command; a system of rules for conduct; correction or physical chastisement' and the Oxford American Dictionary defines the verb as `to train to be obedient and orderly . . . to punish.' Parents who are asked to describe a mother or father who is a good disciplinarian usually come close to those dictionary definitions with descriptions like `someone who gives clear orders and punishes consistently if children disobey.' That is what most observers want parents to do and complain that they do not do."
 Penelope Leach, CHILDREN FIRST, WHAT OUR SOCIETY MUST DO — AND IS NOT DOING — FOR OUR CHILDREN TODAY, Alfred A Knopf, New York (1994). Pp. 115-116.
The respondent claims DCF did not offer him services and did not consider relative placement for the child. With respect to the offer of services, DCF can only provide limited services that directly benefit an incarcerated person. One such service is visitation. DCF did make very modest and unenthusiastic efforts in the direction of visitation.
It no doubt was troubling for the DCF worker to contemplate prison visitation for the infant. Initially, the child was fragile and medically at risk, according to the pediatrician. The child was one year old before the child was medically strong enough to be transported to the prison for visitation. The child vigorously rejected leaving the foster mother and traveling with the DCF worker. The entire visit was marked by the child's emotional distress. The DCF worker testified that the child cried and was irritable practically from departure to return.
From the child's standpoint, the child is transported by someone he does not know, on a long car ride, and then under very harsh, and perhaps frightening, prison circumstances, is confronted by a person the child has never even seen. To further complicate the visit, Ricardo's undisciplined conduct had placed him in "closed custody" so that the child and the respondent were separated by a partition and the child could only hear the respondent by telephone. Not exactly the best place to establish CT Page 2346 a, hither to non-existent, parent-child relationship. The child robustly rejected these visits.
The pediatrician described the child's situation as tenuous for visitation. The child still had trouble sleeping, a fear of strangers, aggression that he displays to other family members, difficulty in terms of discipline, and he only relates to his foster mother. The doctor testified that anything that strays from that (close contact with the foster mother) was very detrimental to the child's emotional and medical status and his future development would be negatively impacted by even brief separation from the foster mother.
The inherently conflicted mission of the social worker; to unite the family and to protect the child, is clearly seen in this situation. The parent demands "rights" to have DCF transport the child to prison for visitation. The social worker knows, on some level, that this parent is never going to be able to parent this child. Yet he must make an effort. The social worker also recognizes that there is no parent-child relationship and that the child is secure and bonded in the foster home. When one asks the question "whose needs are being met here?," the answer is clear; only the needs of the incarcerated respondent. Prison visitation with a stranger seldom is meeting a child's needs. This dilemma is faced frequently by DCF caseworkers. The child's needs are often subordinated to the incarcerated inmates privilege of visitation. This is an area which requires greater thought by DCF policy makers and an articulated rationale should be made on an individual case basis balancing the interests of both parent and child.
Here however, the court finds that no amount of voluntary DCF sponsored visitation, assistance, services or programs could have transformed Ricardo into a reasonably competent parent with values that society would wish to have a child learn. If the Department of Corrections, with all its' punitive disciplinary resources available, is wholly unable to compel routine compliance with rules and regulations attendant with incarceration, no known, voluntary and non-coercive services available to DCF could possibly bring about rehabilitation of this man. Ricardo is a "system failure" in life.
Both the female and male biological parents now fault DCF for failing to place the infant with their respective families. In the first instance, Myra made no suggestions as to a family CT Page 2347 member. She did not go to court and did not contact DCF. She was either severely disabled by her substance abuse or too embarrassed, when sober, to come forward and participate in decisions regarding her child. Her mother already had two of her children including one year old Matthew.
Ricardo initially told the DCF caseworker that he wanted Myra to take the child when she was able. No family members of either parent promptly came forward and offered to take the child or asked to be considered as a possible placement resource. At one point, Ricardo suggested his sister as a placement resource. DCF investigated the sister, Margarita, and found her to be living with her boyfriend who had a history of risk of injury, larceny, assault and failure to appear charges. While there may have existed numerous family members who might have been suitable to care for the child before he became fully bonded and acclimated in foster care, none were suggested at the appropriate time and none came forward at the appropriate time. The respondents' claims in this regard are without merit.
II Adjudication
The court finds by clear and convincing evidence that this child has previously been adjudicated neglected and uncared for. The parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parents could assume a responsible position in the life of the child. General Statutes 17a-112(c)(3)(B).
The court finds by clear and convincing evidence that the parents have no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent child relationship would be detrimental to the best interest of the child; General Statutes Sec. 17a-112(c)(3)(D).
The child has been abandoned by the female biological parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. G.S. 17a-112(c)(3)(A)
These grounds have existed for more than one year. CT Page 2348
III. Mandatory Findings
The court makes the following factual findings required by17a-112(e):
1) Appropriate and timely services were not provided by the Department of Children and Families due to the parents non-availability for the delivery of such services This finding includes a finding that the conduct of the incarcerated male biological parent while incarcerated prevented him from obtaining available services.
2) The court finds by clear and convincing evidence that the Department of Children and Families made modest efforts to reunify the parents and child given the situation and circumstances. See discussion, infra. Given the male respondents conduct an behavior while incarcerated reasonable efforts would have been inappropriate. § 17a-112(c)(1).
3) The Department, with the approval of the Court, set reasonable and realistic expectations for Ricardo. There was very little compliance or participation by the father. He must accept responsibility for his incarceration and his unacceptable conduct while incarcerated. Myra was not available for participation in planning or services.
4) The child has strong emotional ties with the foster family that has provided the physical, emotional and educational support this child needs. The child has no positive emotional ties to the biological parents.
5) Finding regarding the age of the child. This child is two years of age. The child requires stability of placement and continuity of care. The child's Attorney recommends termination. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected childrenInre Juvenile Appeal (84-CD), 189 Conn. 276 (1983). The Appellate Court has also correctly noted, "[because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . . " In Re AlexanderV., 25 Conn. App. 741, 748, 596 A.2d 930 (1992);
(6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions etc. The parents have not CT Page 2349 made realistic and sustained efforts to conform their conduct to even minimally acceptable parental standards. Giving them additional time would not be beneficial to the child. Myra's recent sobriety while incarcerated may bring about recovery. That would be wonderful. But she has not demonstrated any sobriety outside of a prison. Even if she is on the road to recovery, it is a long slow process. Relapse is often part of recovery. She needs vocational training, daily recovery support, and the least amount of stress possible during the infancy of her recovery. It will be too long a time, with too great a risk, to consider further impermanence for this child. Too much time has already transpired. For Myra it is too little, too late to make it in the best interests of the child to wait longer. In re LuisC.. 210 Conn. 157 (1989); In re Juvenile Appeal183 Conn. 11, 15.(1981)
A) Degree to which parents have maintained contact with the child. See discussion infra.
(B) Degree to which the parents have maintained regular contact or communications with the guardian. No contact is noted.
7) Finding regarding the prevention of a parent from having a meaningful relationship etc. Incarceration itself creates barriers. Ricardo had the opportunity to have physical contact with the child during visitation if he renounced his gang affiliation. (See Exhibit # 3). As the warden noted in his letter "(Ricardo) controls how long he remains without a contact visit with his son." Being a member of a gang was more important than being able to hold his infant son. Ricardo made an election in favor of the gang. No unreasonable conduct is noted. The female parent demonstrated nothing more than sporadic interest and only while incarcerated. In Re Rayna M., 13 Conn. App. 23.
IV. Disposition
The court finds that these grounds have existed over an extended period of time which is greater than one year. The court finds, based upon the testimony and evidence presented, that it would be in the child's best interest to terminate the parental rights of Myra G. and Ricardo G. at this time. This finding is made after considering the child's sense of time, their need for a secure and permanent environment, the relationship that the child has with his foster parents, and the totality of CT Page 2350 circumstances that the termination of parental rights is in the child's best interest. In Re Juvenile Appeal (Anonymous), supra, 177 Conn. at 667-68. See generally, J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of the Child 99(1979); Karr-Morse and Wiley Ghosts from the Nursery, The Atlantic Monthly Press, New York (1997).
Based upon the foregoing findings, the court concludes that it is in the best interests of the child to terminate the parental rights of Myra G. and Ricardo G. It is accordingly, ORDERED that their parental rights are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. A permanency plan shall be submitted within 90 days. A review Plan for Terminated Child shall be filed in accordance with Federal Law.
Judgement may enter accordingly.
F.J. Foley, Presiding Judge.